## IN THE MATTER OF PAUL PAPPAS.

Bristol.   January 5, 6, 1971. — January 29, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, SPIEGEL, REARDON, QUIRICO, & BRAUCHER, JJ.

*Newsman.   Evidence,* Privileged communication.   *Constitutional Law,* Freedom of speech and press.   *Grand Jury.*

There is no newsman's privilege under the First Amendment of the Federal Constitution to refuse to appear and testify before a court or grand jury.   [612]

Statement as to the nature and functions of a grand jury and the supervision of it by the presiding judge.   [613–614]

The fact that a newsman sent to report on civil disorders in a city was admitted to "Black Panther" headquarters only because he promised not to report anything he saw or heard there gave him no privilege to refuse to respond to a subpoena to appear before a grand jury investigating the disorders or to refuse to answer questions by the grand jurors as to what he had seen and heard, and the identities of persons present, in the headquarters.   [606, 614]

MOTION, filed in the Superior Court on September 28, 1970, to quash a subpoena issued to Pappas by a grand jury.

The matter was heard and reported by *Smith,* J.

*William H. Carey* for Pappas.

*Armand Fernandes, Jr.,* Assistant District Attorney, for the Commonwealth.

*Lawrence J. McKay* & *Floyd Abrams,* of New York, for National Broadcasting Company, Inc., *Clarence J. Fried,* of New York, for American Broadcasting Companies, Inc.. and *W. Theodore Pierson* & *J. Laurent Scharff,* of Washington, D. C., for Radio Television News Directors Association, amici curiae, submitted a brief.

*Robert W. Meserve,* for Columbia Broadcasting System, Inc., amicus curiae, submitted a brief.

*James C. Heigham,* for Massachusetts Newspaper Information Service, amicus curiae, submitted a brief.

CUTTER, J. Pappas was employed by a New Bedford television station as a newsman-photographer. In late July, 1970, he was sent to New Bedford to photograph and report on "fires and other turmoil" related to civil disorder then in progress. He wished "to cover . . . a Black Panther news conference" at a boarded up store, which he could not approach because of a barricade. He (about 3 P.M. on July 30) did photograph and record in a street within the barricaded area the reading of a "prepared statement" by one Bob Heard, who "had come outside from . . . Black Panther headquarters." Pappas was told that "he would be guaranteed safe conduct if he did go back" into the barricaded area. About 9 P.M. Pappas "was allowed to enter the . . . store — Black Panther headquarters. As a condition . . . Pappas agreed not to report anything he saw or heard inside the store except a police raid." There "was no raid, so Pappas reported nothing."

Pappas, under subpoena, appeared before the grand jury. He refused to answer certain questions about what he saw and heard in the Black Panther headquarters because (a) he claimed a privilege [1] "to protect the source of information acquired in confidence"; (b) he "had promised not to reveal what he saw or heard" and "a breach of his promise" would make it difficult to get information in the future, thus impairing his means of livelihood; and (c) to reveal it would be "a violation of his rights under the First and Fifth Amendments" to the Constitution of the United States. He suggested also that to reveal information would "give rise to some possible danger to" him.

Grand jurors asked what he had seen and heard, and also the names of persons seen in the headquarters. Certain names were suggested to him. Pappas "answered all other questions" but refused to disclose "what he saw and heard inside the headquarters or the identity of persons there."

---

[1] The judge in his report says that Pappas "does not claim an absolute privilege, but does assert a qualified privilege as a newsman-photographer," because "his information arose out of a confidential relation or agreement." We do not regard Pappas's reference to the Fifth Amendment as having been a claim of any privilege against self-incrimination.

There is outstanding a subpoena requiring Pappas to appear at a further grand jury sitting. "[P]resumably the same questions will be asked and the same refusal to answer will occur."

On September 28, 1970, Pappas filed in the Superior Court a motion to quash the outstanding subpoena. After hearing, a Superior Court judge ruled "that Pappas does not have any privilege and must respond to the subpoena and testify to such questions as may be put to him by the grand jury relating to what he saw and heard, and the identity of any persons . . . seen." The judge then reported the matter for the determination of this court. See G. L. c. 278, § 30A, inserted by St. 1954, c. 528. See also G. L. c. 231, § 111; *Vautier, petr.* 340 Mass. 341, 344–345.

1. We regard the report as having submitted for our determination the correctness of the presiding judge's rulings on the motion to quash. Pappas and several amici curiae [2] have broadly discussed the extent to which the First Amendment may preclude prosecuting officers or grand juries from requiring news gatherers to give evidence concerning information obtained, and matters observed, by them in the course of their contacts with news sources whom they deem to be confidential. We do not have before us [3] the text of any specific questions which Pappas has refused to answer before the grand jury, or any petition to hold him for contempt for his refusal. We have only general statements concerning (a) the inquiries of the grand jury, and (b) the materiality of the testimony sought from Pappas. The record does not show the expected nature of his testimony or

---

[2] Helpful and thorough briefs have been filed by Massachusetts and New York attorneys in behalf of a number of broadcasting, television, and news gathering interests.

[3] A change in the occupant of the office of district attorney for the Southern District took place on the second day of the arguments. The new district attorney has advised the clerk of this court in writing that he intends to press for an extension of the term of service of the members of the grand jury who heard Pappas and also for Pappas's testimony before the grand jury, if permitted to do so by our decision. The case thus is not moot. If the matter is brought again before any court, the record should disclose the precise questions, answers to which were refused, and the full context and purpose of such questions.

what likelihood there is of being able to obtain that testimony from persons other than news gatherers.

We take judicial notice that in July, 1970, there were serious civil disorders in New Bedford, which involved street barricades, exclusion of the public from certain streets, fires, and similar turmoil. We were told at the arguments that there was gunfire in certain streets. We assume that the grand jury investigation was an appropriate effort to discover and indict those responsible for criminal acts.

2. In Massachusetts, the area of privileges concerning confidential communications is limited.[4] The principal authorities are collected in Leach & Liacos, Handbook of Massachusetts Evidence, pp. 134–151, and Hughes, Evidence, §§ 141–142, 161–166, 171–173 (see also §§ 123–128).

The principle that the public "has a right to every man's evidence" (Wigmore, Evidence [McNaughton rev.] §§ 2192, 2285) has been preferred, on the whole, to countervailing interests. Privileges are exceptional. "In general, then, the mere fact that a communication was made in express [or implied] confidence . . . does not create a privilege." Wigmore, op. cit. § 2286, fns. 9, 21. Massachusetts, unlike certain other States, has created no statutory privilege protecting news sources.[5]

---

[4] For example, by statute (G. L. c. 233, § 20A, inserted by St. 1962, c. 372) a privilege between priest and penitent (and like relationships) has been created only recently. No general physician-patient privilege exists (see *Kramer* v. *John Hancock Mut. Life Ins. Co.* 336 Mass. 465, 467) but by St. 1968, c. 418 (inserting G. L. c. 233, § 20B), a privilege has been created with respect to certain communications between a patient and a psychotherapist.

[5] There is no occasion now to consider whether there are constitutional limits upon the extent or form of permissible legislation. See McCormick, Evidence, pp. 164–167. The Massachusetts avoidance of the creation of novel privileges is strongly supported by comments (by Professor Mason Ladd) in Am. Law Inst., Model Code of Evidence, Rules 201–234 (see also pp. 7, 11, 343–347, esp. at p. 346) as follows: "The . . . code does not accept the numerous demands from many groups for new privileges which would |suppress valuable evidence in the solution of causes. It is believed that the harm caused to litigants and to society by keeping from the court the most truthful of facts which would greatly assist in just determination of the cause outweighs what benefits might accrue in enlarging the realm of sanctioned secrecy through privilege. Only in the exceptional cases enumerated . . . [in the code] do the [a]dvisers [to the Institute] deem that social policy warrants the suppression of truth." The Code proposed retaining only (1) the privilege against self-incrimination (Rules 201–208) in modified form (with limitations

The contention recently has been advanced that the First Amendment may give rise to at least a qualified, but probably not absolute, privilege protecting in some degree the news sources of journalists and news collectors for other media. The argument seems to run in general as follows. (1) It is contended that, in some circumstances, to force a newsman to testify before a court or grand jury about events seen by him, or about matters learned by him, in the performance of his duties, may impair the ability of a free press (including other communications media) "to supply the public need for information . . . with respect to . . . significant issues." Cf. *Thornhill* v. *Alabama*, 310 U. S. 88, 102 (State antipicketing statute held invalid). (2) It is urged that some judicial consideration must be given to whether (a) the need for information from the news gatherer as a witness outweighs (b) the possible harm to his ability to obtain news and to the reporting ability of the press. (3) In support of such judicial consideration, it is asserted that the First Amendment [6] creates in the news media and their employees a privilege (or immunity) against such govern-

on the use of criminal records for impeachment of credibility); (2) the privilege or disqualification in attorney-client, priest-penitent, physician-patient, husband-wife situations (Rules 209–223); (3) privileges (somewhat limited) concerning disclosure of religious belief, political votes, trade secrets, State secrets, official information, and communications to a grand jury, and the names of informers about criminal violations (Rules 224–230). No newsman's privilege (see p. 345) was accepted by the Institute.

[6] Articles discussing the claimed newsmen's privilege lay emphasis on the language in decisions of the Supreme Court of the United States dealing with other applications of the First Amendment. See e.g. *National Assn. for the Advancement of Colored People* v. *Alabama*, 357 U. S. 449, 460–466; *National Assn. for the Advancement of Colored People* v. *Button*, 371 U. S. 415, 431–433, 438; *Dombrowski* v. *Pfister*, 380 U. S. 479, 486–487; *Time, Inc.* v. *Hill*, 385 U. S. 374, 389; *United States* v. *Robel*, 389 U. S. 258, 268, fn. 20. Cf. *Estes* v. *Texas*, 381 U. S. 532, 538–540. Such articles include Guest and Stanzler, The Constitutional Argument for Newsmen Concealing Their Sources, 64 N. W. U. L. Rev. 18; Beaver, the Newsman's Code, 47 Ore. L. Rev. 243. Notes, 9 Clev. Mar. L. Rev. 311; 72 Harv. L. Rev. 768; 46 Ore. L. Rev. 99; 11 Stan. L. Rev. 541; 36 Va. L. Rev. 61. See also Thayer, Legal Control of the Press, §§ 60–64; 69 Col. L. Rev. 808; 70 Yale L. J. 1084. Problems, in some degree analogous to the conflicting interests of the proper administration of justice and the press were considered in *Sheppard* v. *Maxwell*, 384 U. S. 333, 352–355, *Tribune Review Publishing Co.* v. *Thomas*, 254 F. 2d 883, 884–885 (3d Cir.), and *Seymour* v. *United States*, 373 F. 2d 629, 631–632 (5th Cir.).

mental action as may induce either press self-censorship or inability of the press to obtain information.[7]

Professor Edmund M. Morgan in his preface to the American Law Institute's Model Code of Evidence, p. 7, expressed the prevailing understanding about "privileges against disclosure of relevant data. *Such a privilege suppresses valuable evidence to which the trier of fact is competent to give its proper weight. So serious an interference with a rational inquiry* can be justified only by accompanying social benefits of high worth. It may be conceded that the harm done to the litigant and to society by refusing to compel the disclosure of pertinent facts may sometimes be outweighed under existing conditions by benefits to society in general accruing from the preservation of a confidential relationship or from protection against official oppression. But a mere sentiment or an outgrown theory as to relative social values can no more serve as a determining factor than can a consideration of professional pride of particular callings. *If a privilege to suppress the truth is to be recognized at all, its limits should be sharply determined so as to coincide with the limits of the benefits it creates.* In many decisions this principle is disregarded, sentiment serves for judgment, and rhetoric is substituted for reason. The common law and statutory privileges have been carefully reëxamined [by the framers of the Model Code] and have in great measure been retained in the Code with important modifications" (emphasis supplied).[8]

---

[7] Reliance is placed on *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279, 283, or upon some extension of the reasoning of that opinion. The *New York Times Co.* case, of course, did not deal with the duty of a news gatherer to testify to facts disclosed to him or to events seen by him. See also *Barenblatt* v. *United States,* 360 U. S. 109, 126 (where somewhat apposite language was used by the court in a context wholly different from any consideration of a newsman's privilege).

[8] The relatively few privileges included in the Model Code are listed in fn. 5, *supra.* Such authority as exists in Massachusetts suggests no legislative policy of extending the scope of privileges. See *Attorney Gen.* v. *Pelletier,* 240 Mass. 264, 306–307, holding that G. L. c. 147, § 28 (see later revision of § 28 by St. 1960, c. 802, § 1, and amendment by St. 1968, c. 22), affords no such privilege to employees of licensed private detectives. Our cases are not in accord with the conclusions of the authors in some of the articles (supporting the claimed privilege) already cited. See fn. 6, *supra.*

The cases in general have supported Professor Morgan's views. They also recognize that, in exercising the judicial power to compel testimony, some consideration of conflicting public interests is appropriate to prevent unreasonably broad, unnecessary, irrelevant, or needlessly burdensome enquiry. See *Garland* v. *Torre,* 259 F. 2d 545, 548–551 (2d Cir.), cert. den. 358 U. S. 910; *Brewster* v. *Boston Herald-Traveler Corp.* 188 F. Supp. 565 (D. Mass.); *Clein* v. *State,* 52 So. 2d (Fla.) 117, 120–121; *Re Goodfader,* 45 Hawaii, 317, 322–344; *People ex rel. Mooney* v. *Sheriff of N. Y. County,* 269 N. Y. 291, 293–295; *State* v. *Buchanan,* 250 Ore. 244, 247–249. See also *Taylor & Selby Appeals,* 412 Pa. 32, 38–40, 41–42 (holding that newsmen were protected by a Pennsylvania statute from disclosing sources of news and certain other matters, but stating that no constitutional privilege of nondisclosure exists). Cf. *Ex parte Sparrow,* 14 F. R. D. 351, 352–353 (N. D. Ala. — decision based on Alabama statutory privilege). A statutory newsman's privilege has been strictly construed. *Brogan* v. *Passaic Daily News,* 22 N. J. 139, 150–154.

Pappas and the amici seem greatly to rely on one recent case which goes substantially beyond existing authority. See *Caldwell* v. *United States,* 434 F. 2d 1081 (9th Cir.), revg. 311 F. Supp. 358, 359 (N. D. Cal.). In that case, application was made to the District Court to quash a subpoena requiring Caldwell, a reporter for The New York Times, to testify before a Federal grand jury concerning interviews alleged by Caldwell to be "confidential and within the scope of a relationship of trust, maintained by him as a professional journalist, with members of the [Black] Panther Party." The District Court opinion affords little information concerning what matters were being investigated by the grand jury, beyond a finding (p. 361) that Caldwell's testimony "will relate to activities of members of the . . . [p]arty." The judge found also that for Caldwell to be compelled to make disclosure would jeopardize his relationship with news sources and impair his "ability to gather, analyze, and publish the news." Caldwell was ordered (p. 360) to appear.

The district judge, however, issued (p. 362) a protective order (1) that Caldwell would not be "required to reveal confidential associations, sources, or information received," (2) that he would not be required to answer questions about statements to him by party members unless given to him for publication or public disclosure, and (3) that he could consult counsel during the inquiry. Otherwise the motion to quash was denied, with leave to the government to present testimony of "a compelling and overriding national interest in requiring . . . testimony which cannot be served by any alternative means."

Upon Caldwell's appeal, a majority of a panel of the Ninth Circuit (one judge concurring on somewhat different grounds) made the following statements, among others: (1) The First Amendment (see 434 F. 2d at p. 1086) requires recognition of a qualified newsman's privilege, to the extent at least of the district judge's protective order. (2) "To convert news gatherers into Department of Justice investigators is to invade the autonomy of the press by imposing a governmental function upon them. . . . [T]his, where it has not been shown to be essential to the [g]rand [j]ury inquiry simply cannot be justified in the public interest." See 434 F. 2d at p. 1086. (3) To require Caldwell to appear at all (in view of "the scope of the privilege embodied in the protective order") would imperil "the public's First Amendment right to be informed." There must be demonstration by the government of "a compelling need for the witness's presence" before judicial process may issue to require his attendance. Compare our view stated below that the burden rests on a witness to show that a grand jury inquiry is unreasonable. (4) A judgment of contempt and the order directing Caldwell's attendance before the grand jury were ordered vacated. Cf. *Levin* v. *Marshall*, 317 F. Supp. 169 (D. Md.), where a somewhat similar problem appears to have been dealt with by limitation of an unduly broad subpoena.

Judge Jameson, in his concurrence in the *Caldwell* case, properly noted that Congress had not "enacted legislation

to accord any type of privilege to a news reporter." Were
we to adopt the broad conclusions[9] of that decision, that
a newsman's privilege exists because of the First Amend-
ment, we would be engaging in judicial amendment of the
Constitution or judicial legislation. Requiring a newsman
to testify about facts of his knowledge does not prevent their
publication or the circulation of information. Any effect on
the free dissemination of news is indirect, theoretical, and
uncertain, and relates at most to the future gathering of
news. The opinion in the *Caldwell* case largely disregards
important interests of the Federal government and the
several States in enforcement of the criminal law for the
benefit of the general public. We are of the view also that
the opinion unnecessarily expresses, in terms of newly dis-
covered constitutional absolutes, interests of the news media,
which (so far as reasonably requiring protection) may be
guarded by sound judicial discretion and administration.
See the analogous issues discussed in Friendly, The Bill of
Rights as a Code of Criminal Procedure, 53 Cal. L. Rev. 929.
We adhere to the view that there exists no constitutional
newsman's privilege, either qualified or absolute, to refuse
to appear and testify before a court or grand jury.[10] The
obligation of newsmen, we think, is that of every citizen,
viz. to appear when summoned, with relevant written or
other material when required, and to answer relevant and
reasonable inquiries. Such appearances, however, like those
of other citizens, are subject to supervision by the presiding
judge to prevent oppressive, unnecessary, irrelevant, and
other improper inquiry and investigation (and, of course,

---

[9] The general language of the opinion is unrelated to any precise state-
ment of whatever facts appeared in the record. That general language, of
course, may have been caused in part either (a) by failure of the United States
Attorney to make clear the precise situation and alleged offences under in-
vestigation, as well as the pertinence of Caldwell's testimony, or (b) by an
unduly comprehensive grand jury investigation into political activities un-
related to specific criminal incidents.

[10] We have, in this case, no occasion to consider appearances before legis-
lative or administrative bodies. Cf. Davis, Administrative Law Treatise,
§§ 3.06, 3.12.

subject to due protection of the privilege of any witness against self-incrimination).[11]

3. The grand jury is "an informing and accusing body, rather than a judicial tribunal." See *Commonwealth* v. *Geagan,* 339 Mass. 487, 497–499, and cases there collected. See also Smith, Criminal Practice and Procedure, §§ 781–783, 802; note, 74 Harv. L. Rev. 590. As "an appendage, a branch, an integral part of the court acting under the authority of the court," the grand jury members are subject to the supervision and guidance of the presiding judge. See *Grand Jurors for Worcester County for the Year 1951* v. *Commissioner of Corps. & Taxn.* 329 Mass. 89, 91. It is the judge's duty to prevent interference with them in the performance of their proper functions, to give them appropriate instructions, and to assist them in the performance of their duties. See *Commonwealth* v. *McNary,* 246 Mass. 46, 50–51.[12] In exercising supervision over the grand jury, the presiding judge has discretion (1) to act in aid of effective judicial administration and (2) to prevent excessive or unnecessary interference with the legitimate interests of witnesses, e.g. by too broad subpoenas. See *Hale* v. *Henkel,* 201 U. S. 43, 75–77. See also *See* v. *Seattle,* 387 U. S. 541, 544–545; *Finance Commn. of Boston* v. *McGrath,* 343 Mass. 754, 761–768.

On the meager record before us, we can do no more than to state (1) that a grand jury, to carry out its ancient and

[11] The briefs of amici in this case reflect substantial news media pressure for adoption of the principles of the *Caldwell* case. We make no attempt to predict what a majority of the Supreme Court of the United States will decide when and if issues raised by that case reach that court. See *Opinion of the Justices,* 349 Mass. 786, 791. For Massachusetts opinions dealing with First Amendment matters, see e.g. *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230, 249–250; *Krebiozen Research Foundation* v. *Beacon Press, Inc.* 334 Mass. 86, 94–99; *Opinion of the Justices, supra,* at pp. 791–793; *Commonwealth* v. *Baird,* 355 Mass. 746, 751–752.

[12] Various respects in which grand juries have been given assistance or supervision are reflected in our cases. See *Commonwealth* v. *Ventura,* 294 Mass. 113, 120–121; the *Grand Jurors for Worcester County* case, 329 Mass. 89, 90–91, *supra* (protection of privileged matter); *Murphy* v. *Commonwealth,* 354 Mass. 81, 82–84 (privilege against self-incrimination; but cf. *Gambale* v. *Commonwealth,* 355 Mass. 394, 396–398). See also general discussion in the *McNary* case, 246 Mass. 46, 50–51.

important public function, must be allowed appropriate scope of investigation; (2) that it is the duty of all citizens having relevant knowledge to assist in such inquiries when called upon to do so; (3) that the burden rests upon a witness, asserting impropriety in a grand jury inquiry, to establish that the grand jury inquiry is improper or oppressive; and (4) that, in exercising his supervisory discretion, the presiding judge (with respect to the examination of *any* witness and not merely as to news gatherers) may take into account all pertinent circumstances affecting the propriety, purposes, and scope of the grand jury inquiry[13] and the pertinence of the probable testimony[14] of the particular witness to the investigation in progress.

4. On the limited facts reported to us, the ruling of the Superior Court judge was correct. The matter is to stand in the Superior Court for further proceedings.

*So ordered.*

---

[13] It may be argued that use of newsmen as witnesses is likely to result in unnecessary or burdensome gratuitous use of their work product (cf. *Ramacorti* v. *Boston Redevelopment Authy.* 341 Mass. 377; Wigmore, Evidence [McNaughton rev.] § 2203) where the testimony of police or other witnesses would suffice. This, if shown, a presiding judge may consider in his discretion.

[14] Massachusetts judges and grand juries, of course, are not bound by (although they may consider) recently promulgated Department of Justice guidelines, designed to reduce conflicts concerning the use of newsmen's testimony. See (August 25, 1970) 39 U. S. L. Week 2111. Cf. *Levin* v. *Marshall*, 317 F. Supp. 169, 172–174 (D. Md.). We do not suggest that a general investigation of mere political or group association of persons, without substantial relation to criminal events, may not be viewed by a judge in a somewhat different manner from an investigation of particular criminal events concerning which a newsman may have knowledge.