IN THE MATTER OF WALTER F. ROCHE, JR.

Suffolk. July 16, 1980. — October 15, 1980.

Present: HENNESSEY, C.J., QUIRICO, WILKINS, LIACOS, & ABRAMS, JJ.

*Newsman. Evidence,* Privileged communication. *Constitutional Law,*
Freedom of speech and press. *Discovery. Commission on Judicial
Conduct. Judge.*

In a proceeding before the Commission on Judicial Conduct hearing
formal charges against a judge, a newsman who had participated in
preparing an investigative report concerning misconduct by the judge
was not, in the circumstances, privileged by the First Amendment to
the United States Constitution to refuse to divulge his confidential
sources at a deposition. [630-636]

In a proceeding before the Commission on Judicial Conduct hearing
formal charges against a judge, a newsman was properly ordered to
divulge his confidential sources at a deposition, under the general au-
thority of a judge or administrative tribunal to supervise discovery,
where any prior inconsistent statements contained in the newsman's
interviews with potential witnesses against the judge would be highly
relevant to the judge's defense and no other source existed for those
statements and where the effect of such an order on the newsman's
ability to protect the confidentiality of his sources would be minimal.
[636-638]

Discussion of the need to develop common law rules capable of governing
the conflict between the public interest in free and informed expression
and the equally compelling public interest in securing all evidence
necessary to fair and adequate adjudication. [638-640] QUIRICO, J.,
with whom LIACOS, J., joined, dissenting to so much of the discussion
as appears to be a current commitment to a future recognition of a
common law equivalent of a press "shield" law.

MOTION to compel discovery filed in the Supreme Judicial
Court for the county of Suffolk on June 4, 1980.

PETITIONS for contempt filed in the Supreme Judicial
Court for the county of Suffolk on July 9, 1980, and July 10,
1980, respectively.

The proceedings were heard by *Kaplan, J.*

*Matthew H. Feinberg* (*Mary C. Leonard* with him) for Walter F. Roche, Jr.

*J. Albert Johnson* (*Thomas J. May* with him) for Elwood S. McKenney.

*Donald K. Stern,* Assistant Attorney General, for the Commission on Judicial Conduct.

*Jerome P. Facher,* Special Counsel to the Commission on Judicial Conduct, pro se (*James L. Quarles, III,* with him).

ABRAMS, J. A single justice of the Supreme Judicial Court adjudicated Walter F. Roche, Jr., in civil contempt for refusing to comply with an order that Roche testify fully at a deposition. On appeal,[1] Roche contends that his status as a reporter for a television station frees him from the discovery obligations applicable to other persons by entitling him to assert, in his discretion, a right to refuse to disclose the identities of his "confidential sources." Alternatively, Roche claims that the single justice abused his discretion by declining to prevent what Roche terms "oppressive, unnecessary, and irrelevant" discovery. We disagree, and affirm the orders of the single justice.

As a reporter, employed by WBZ-TV, Westinghouse Broadcasting Corporation, Roche participated in preparing and presenting the station's investigative report on certain judges in the District Court Department. A series of alleged abuses were described by Roche in a broadcast aired by the

---

[1] The case is before us on Roche's expedited appeal from both the order by the single justice that he testify fully at the deposition and the subsequent order holding him in contempt for refusing to do so. An adjudication of civil contempt against a nonparty constitutes a final judgment appealable pursuant to Mass. R. A. P. 1 (c), 365 Mass. 844 (1974). See *Commonwealth* v. *Winer,* 380 Mass. 934, 935 (1980); *Katz* v. *Commonwealth,* 379 Mass. 305, 311 (1979). This result is consistent with analogous Federal authority. *United States* v. *Ryan,* 402 U.S. 530, 533 (1971). *Cobbledick* v. *United States,* 309 U.S. 323, 327-328 (1940). *In re Murphy,* 560 F.2d 326, 332-333 n.10 (8th Cir. 1977). The validity of an underlying discovery order, disobedience of which has led to an adjudication of contempt, may be challenged on appeal from the adjudication of contempt. See generally, 15 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 3914, at 567-585 (1976 & Supp. 1979).

station on January 11, 1979. Acting on the basis of a complaint grounded on this broadcast, the Commission on Judicial Conduct commenced an investigation of Judge Elwood S. McKenney. See *McKenney* v. *Commission on Judicial Conduct,* 380 Mass. 263, 264 n.4 (1980).

Over a ten-month period, special counsel appointed[2] to conduct this investigation deposed some seventy persons, including Roche.[3] On the basis of this extensive investigation by special counsel, the commission filed formal charges against Judge McKenney on April 11, 1980, and scheduled a hearing on these charges for July 17, 1980. The commission disclosed to the judge, at his request, transcripts of all depositions taken by the special counsel and furnished the judge with a list of sixty-five persons who might be called as witnesses at its hearing on the charges.

In preparing his defense against the commission's charges, Judge McKenney sought from the commission, and was granted, an order authorizing him to depose eleven of these sixty-five potential witnesses, including Roche. See G. L. c. 211C, § 2. Commission on Judicial Conduct Operating Rule 13(d).

Roche appeared at the requested deposition and answered all questions regarding his own observations. He also answered questions regarding his interviews with three persons whose identities were revealed by their appearances on the broadcast. Roche stated that all of his sources were included in the commission's list of sixty-five potential witnesses, and also named certain persons whom he had not interviewed. Roche refused, however, to answer any questions which in his judgment would "reveal confidential sources or could reasonably lead to the revealing of confidential sources."

---

[2] Special counsel was appointed by this court pursuant to G. L. c. 211C, § 2.

[3] At this deposition, Roche described his personal observations and conversations with persons whose identities were revealed through the broadcast. Roche was not asked and did not reveal the identity of his "confidential sources."

Faced with this refusal, Judge McKenney applied to the single justice for an order compelling Roche to testify fully both as to the identity of the persons he interviewed and the information he thereby obtained. Roche simultaneously sought from the single justice a protective order blocking this requested testimony.

The single justice referred both motions to the commission. Relying on our decisions in *Matter of Pappas*, 358 Mass. 604 (1971), aff'd sub nom. *Branzburg* v. *Hayes*, 408 U.S. 665 (1972), and *Dow Jones & Co.* v. *Superior Court*, 364 Mass. 317 (1973), the commission in a written decision rejected Roche's claim that the First Amendment to the Constitution of the United States creates a qualified newsman's privilege against disclosure of sources during pretrial discovery in a civil proceeding. In addition, after balancing the interests of Judge McKenney and Roche, the commission declined to exercise its discretion to limit the scope of discovery. The commission reasoned that at the hearing on the charges against him, Judge McKenney would be entitled to test the credibility of any witness who might be called against him by a prior inconsistent statement made to Roche. Such statements, if any, would be unavailable from any other source. The commission therefore concluded that the relevance of the requested discovery was "hardly 'attenuated or remote,'" quoting from *Ward* v. *Peabody*, 380 Mass. 805, 819 (1980).

In the face of the Commission's denial of his motion for a protective order, Roche renewed his motion for such an order before the single justice.[4] In denying this motion, the

---

[4] Judge McKenney similarly renewed his motion to compel discovery. Judge McKenney also moved that, in view of Roche's refusal to comply with the discovery order, the entire proceeding before the commission should be dismissed. This motion suggested that the "media must be put on notice that allegations of judicial misconduct will not be considered by the Commission on Judicial Conduct unless the media representatives are willing to disclose the sources and identify [the information] . . . relied upon in making the allegations of misconduct." While McKenney does not appeal the denial of this motion by the single justice, we note that Roche is not a party to the proceedings before the commission. Cf. Mass.

single justice concluded that he could find "no basis for any essential disagreement with the Commission."

While thus indorsing the commission's decision, which had stressed the relevance of Roche's testimony to Judge McKenney's presentation at the formal proceedings against him, the single justice also pointed to what he termed the absence of any "theoretic or practical" impact on Roche's asserted interests likely to result from the requested discovery. The single justice noted that six persons had indicated during their depositions by Judge McKenney that they had been interviewed by Roche. Three of those persons had appeared on the television broadcast, while the other three had not been identified previously. Roche agreed to be deposed as to his conversations with these six persons. In effect, the single justice found that while Roche maintained that he was not willing to initiate identifications, he would be willing to be deposed as to his discussions with any person whose identity as a source was otherwise revealed. Since Roche had already indicated that all of his sources were included in the commission's list of sixty-five potential witnesses, the single justice reasoned that in essence what Roche was demanding was that prior to fully deposing him, Judge McKenney first ask all other potential witnesses a single question, namely, whether they had been interviewed by Roche. In view of the fact that by following this time-consuming but otherwise purely mechanical approach Judge McKenney could readily establish a list of all those persons interviewed,[5] and would therefore be able to

---

R. Civ. P. 37 (b) (2) (C), 365 Mass. 797 (1974). After a ten-month investigation by special counsel and the filing of formal charges by the commission, the proceedings against the judge cannot be fairly described as a dispute between the judge and a reporter. Nor is there any indication in the record before us that the commission is proceeding on the basis of "[b]road and unsubstantiated allegations [which], no matter how sensational, do not become a sufficient basis for [commission action] merely by being published or broadcast." *McKenney* v. *Commission on Judicial Conduct*, 380 Mass. 263, 267 (1980).

[5] Roche does not suggest that his sources would perjure themselves by denying that they spoke to him, or that he would enjoy a continued right

depose Roche fully, the single justice concluded that the
protective order sought by Roche amounted "simply to a
shuffle as to priority of time."

The single justice therefore ordered the further deposition
of Roche to proceed as ordered by the commission. When
Roche again refused to testify as to the identity of his
sources, the single justice adjudicated him in civil contempt,
and ordered Roche committed until he either purged him-
self or was "otherwise relieved by order of the court." After
oral argument we affirmed the order of the single justice en-
titled "Adjudication of Civil Contempt."[6]

There appear to be at least four bases on which this ad-
judication of contempt and the underlying order compelling
Roche to testify fully might arguably have been challenged:
(1) the First Amendment to the United States Constitution;
(2) art. 16 of the Declaration of Rights of the Massachusetts
Constitution; (3) a common law evidentiary rule; and (4)
the general duty of a judge or an administrative tribunal to
supervise the discovery process so as to avoid oppressive, un-
necessary, and irrelevant discovery. Cf. Mass. R. Civ. P. 26
(c), 365 Mass. 772 (1974). Roche relies on only the first and
fourth of these arguments,[7] and we therefore intimate no

---

to refuse to identify a source if such perjury did occur. Neither the record
nor Roche suggests that any of the sources are likely to invoke their Fifth
Amendment privilege against self-incrimination as a basis for refusing to
be deposed by Judge McKenney.

[6] Roche subsequently made an application to Mr. Justice Brennan for a
stay. Mr. Justice Brennan entered an order granting the stay of enforce-
ment of the order of the single justice adjudicating Roche in contempt,
pending timely petition for writ of certiorari and disposition thereof. *In
re Roche,* 448 U.S. 1312 (1980).

[7] On this appeal, Roche asserts, for the first time and without explana-
tion, that a news reporter's privilege may also be "derived" from art. 16
of the Declaration of Rights of the Massachusetts Constitution. Even if
we were to treat this naked assertion as appellate argument, this claim
was made to neither the Commission on Judicial Conduct, nor to the sin-
gle justice, and therefore is not properly before us. See Mass. R. A. P. 16
(a) (4), as amended, 367 Mass. 919 (1975); *Commonwealth* v. *Amazeen,*
375 Mass. 73, 84 n.9 (1978); *Jones* v. *Wayland,* 374 Mass. 249, 252 n.3
(1978).

view as to the validity of his claims under either the State Constitution or a rule of common law.

At the outset, it is important to recognize those issues which are not involved in this action. This is not a case where compelling a journalist to testify about his past news-gathering activities will result in the identification of other-wise unidentifiable sources. Since Roche has already admitted that all of his sources are named in the commission's list of sixty-five potential witnesses, and since Judge McKenney may depose each of those witnesses individually and ask if they provided Roche with information, the question here is not whether the identities of those sources will be revealed, but when they will be revealed, and to what lengths Judge McKenney will have to go to obtain this information.

This is also not a case in which Fifth Amendment rights are implicated. Neither Roche nor any of the deponents who have admitted being Roche's sources have invoked the privilege against self-incrimination, and there has been no indication that future witnesses will do so. Nor does this case involve the duty of a news reporter to reveal perjury, when the knowledge that such an act has been committed is based solely on confidential information. While several recent cases have required courts to define and to clarify the rights of journalists, so as to minimize interference with the important news-gathering and information-disseminating role they play in our society, this is not such a case. The one issue that is raised here is whether a news reporter may regulate the order of discovery and thereby postpone the release of information, the revelation of which is a foregone conclusion.

*First Amendment claim.* Roche argues that the First Amendment to the United States Constitution requires that a news reporter who is not a party to a judicial proceeding must be granted the privilege of refusing to divulge his or her confidential sources at a deposition unless the party seeking the information meets the burden of showing that (1) the information sought is relevant; (2) the information is not otherwise available; and (3) the information is central to

the party's case. Only the second of these three tests is seriously at issue here since any prior inconsistent statements of principal witnesses that Judge McKenney might secure by fully deposing Roche would be both relevant and central to Judge McKenney's presentation before the commission. "If impeachment evidence [consisting of prior inconsistent statements possibly made by a principal witness to a reporter in a "confidential" interview] is available, it is critical that the defendants have access to it." *United States* v. *Liddy*, 354 F. Supp. 208, 215, stay of execution of contempt judgment denied, 478 F.2d 586 (D.C.Cir. 1972). Roche acknowledges, furthermore, that such statements are unavailable from any source other than himself. He contends, however, that these statements are "otherwise available" in that Judge McKenney could obtain them by first deposing all other potential witnesses to determine whether they were interviewed, and then deposing Roche as to his conversations with those persons who acknowledged being interviewed. In order to protect his rights as a journalist, Roche asserts, Judge McKenney must be required to conduct discovery in this order.

As an initial matter, the United States Supreme Court has established that the First Amendment does not "grant newsmen a testimonial privilege that other citizens do not enjoy." *Branzburg* v. *Hayes*, 408 U.S. 665, 690 (1972).[8] Mr. Justice Powell, upon whose concurrence in *Branzburg* Roche places great reliance, would appear to be of the same opinion: "[P]ersons who become journalists acquire thereby no special immunity from governmental regulation." *Saxbe* v. *Washington Post Co.*, 417 U.S. 843, 857 (1974) (Powell, J., dissenting). See also *Matter of Pappas*, 358 Mass. 604, 612 (1971); *Dow Jones & Co.* v. *Superior Court*, 364 Mass. 317, 325 (1973).[9]

---

[8] We are not free to construe the First Amendment as creating a constitutional protection broader than that established by the Supreme Court. *Oregon* v. *Hass*, 420 U.S. 714, 719 (1975).

[9] The powerful rostrum of a newsroom or a broadcast studio may confer status of a type that is both real and laden with responsibility, but not, in

We therefore examine Roche's claim in light of the general right of any person to gather information and prepare it for expression. Some protection for such information gathering must exist if the First Amendment is to serve adequately its central purpose of facilitating intelligent decisions by a self-governing people. See *Whitney* v. *California*, 274 U.S. 357, 375-376 (1927) (Brandeis, J., concurring). See also *Branzburg* v. *Hayes*, 408 U.S. 665, 681 (1972) ("Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated"). Furthermore, we have no doubt that in certain circumstances the extension of a pledge of confidentiality may significantly aid in the process of gathering information. See *Riley* v. *Chester*, 612 F.2d 708, 714 (3d Cir. 1979). Cf. Civil Service Reform Act of 1978, 5 U.S.C. § 1206(b) (1) (B) (Supp. II 1978) (guaranteeing gov-

our view, status of constitutional dimension. Rather than endowing those persons or corporate entities who qualify as members of an institutional "press" with special status "freedom of the press" protects freedom of expression by prohibiting impermissible licensing or other regulation of the means essential to the wide dissemination of any expression. It is possible to imagine a society in which an individual would be totally free to speak out and yet be barred from otherwise disseminating his or her views. Ours, fortunately, is not such a society. See *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 795-802 (1978) (Burger, C.J., concurring). Compare Van Alstyne, Comment, The Hazards to the Press of Claiming a 'Preferred Position,' 28 Hastings L.J. 761 (1977), with Mr. Justice Stewart, Or of the Press, 26 Hastings L.J. 631 (1975). While the Court has yet to specify the institutional meaning, if any, to be given to the term "press" as used in the First Amendment, see *First Nat'l Bank* v. *Bellotti*, *supra* at 798 (Burger, C.J., concurring), it has consistently treated the First Amendment interests of the institutional press as no greater or less than those of the general public. See *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555, 577 n.12 (1980) (opinion of Burger, C.J.) (press representatives entitled to same right to attend trial as general public); *Houchins* v. *KQED*, 438 U.S. 1, 16 (1978) (plurality opinion) ("media have no special right of access to [a county jail] different from or greater than that accorded the public generally"); *Zurcher* v. *Stanford Daily*, 436 U.S. 547 (1978) (no special standards for issuance of search warrants for searches of newspaper offices); *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964) (press and public defendants extended the same First Amendment protection in libel action brought by public figure).

ernment "whistle blowers" a right to anonymity). We do not agree, however, that the First Amendment requires that such a pledge be honored absent the showing of relevance, uniqueness, and certainty suggested by Roche.

"The need to develop all relevant facts in the adversary system is both fundamental and comprehensive." *United States* v. *Nixon,* 418 U.S. 683, 709 (1974) (holding that President of the United States must comply with subpoena duces tecum in a criminal case). On the basis of the record before us, we do not believe that the First Amendment creates at the level of constitutional doctrine an exception to the "longstanding principle that 'the public . . . has a right to every man's evidence.'" *Branzburg* v. *Hayes,* 408 U.S. 665, 688 (1972), quoting from *United States* v. *Bryan,* 339 U.S. 323, 331 (1950). While the question before us involves Roche's testimony at a deposition in a civil matter rather than his appearance before a grand jury in a criminal case, we cannot discern a constitutionally significant difference between the public interest in securing the accurate resolution of charges of judicial misconduct and the corresponding interest in securing accurate criminal convictions.[10] See *Branzburg* v. *Hayes, supra; Matter of Pappas,* 358 Mass. 604, 609 (1971). Furthermore, since Roche is not a party to the dispute out of which his refusal to reveal his sources arises, it is impossible to tailor an alternative remedy other than to compel disclosure. See *Downing* v. *Monitor Publishing Co.,* 120 N.H. 383, 387-388 (1980) (defendant in libel

---

[10] In many respects the commission's functions parallel those of a grand jury. Following investigation by special counsel and the filing of formal charges, the commission sits in a nonpublic session, where it determines whether or not to recommend disciplinary action to this court. G. L. c. 211C. See *McKenney* v. *Commission on Judicial Conduct,* 377 Mass. 790, 794-795 (1979). See also The Newsman's Privilege after *Branzburg:* The Case for a Federal Shield Law, 24 U.C.L.A. L. Rev. 160, 180 (1976) ("[W]here an agency is exercising its quasi-judicial power to criminally investigate and prosecute, the agency's subpoena powers should enjoy the same wide scope as that given to both grand juries and criminal prosecutors," and *Branzburg* "require[s] a balancing in favor of compelling disclosure of any confidential news sources or information in the agency setting").

action not required to disclose sources but that refusal to disclose same creates a presumption that no such sources existed).

Nothing could be more general in its applicability than a rule that requires all persons to testify at a deposition in the absence of a constitutional,[11] statutory, or common law privilege.[12] Requiring Roche to testify therefore imposes "no restraint on what newspapers may publish or on the type or quality of information reporters may seek to acquire." *Branzburg* v. *Hayes,* 408 U.S. 665, 691 (1972). There exists, moreover, no indication on the record before us that Roche's deposition as to the identity of his sources

---

[11] The only privilege of Federal constitutional dimension available at deposition to a witness such as Roche is the Fifth Amendment right against self-incrimination. *Branzburg* v. *Hayes,* 408 U.S. 665, 689-690 (1972). See *United States* v. *Nixon,* 418 U.S. 683 (1974) (recognizing limited "executive privilege").

[12] Whether the person from whom evidence is sought be television reporter Walter F. Roche, Jr., or President Richard M. Nixon, "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States* v. *Nixon,* 418 U.S. 683, 710 (1974). It is equally true, however, that the protection of a number of important interests is felt to require the withholding of probative evidence. See generally, W.B. Leach & P.J. Liacos, Massachusetts Evidence 134-164 (4th ed. 1967). The most important of these interests is a person's right to refuse to give incriminating testimony against himself; significantly, this privilege against self-incrimination "exists at common law apart from all constitutional and statutory provisions." *Id.* at 151. See also Fifth Amendment to the United States Constitution; Part I, art. 12 of the Massachusetts Constitution; G. L. c. 233, § 20; G. L. c. 231, § 63. The need to protect the confidential relationship between client and attorney required the creation of the attorney-client privilege at the option of the client. Jurors, both petit and grand, and members of judicial or quasi judicial bodies are disqualified by the common law from testifying as to their deliberations. W.B. Leach & P.J. Liacos, *supra* at 145, and cases cited. The common law extends to the government a qualified privilege to refuse to disclose both the source for and content of communications made to it to secure enforcement of the law, *id.* at 146, but with risk of dismissal of prosecution. Privileges have also been created in the case of reports whose filing is required by statute or administrative regulations where the privilege is said by the court to be required by legislative intent, fairness, or a need to fulfil the purpose of the statute or regulation.

has been sought for any purpose other than Judge McKenney's legitimate aim of preparing a defense to pending charges by seeking to discover prior inconsistent statements of those persons likely to be principal witnesses against him.

Finally, we note that our decision today reflects the speculative nature of the harm Roche asserts will occur to the free flow of information if we fail to recognize that those in his position have a constitutional right to refuse to reveal their sources. Should discernible harm to the flow of information actually develop, the First Amendment might well require the type of qualified privilege asserted by Roche. But, as we have stated above, since Roche himself has already provided enough information for Judge McKenney to identify Roche's sources, the danger of such harm resulting from Roche's further testimony is negligible. The First Amendment, furthermore, does not define the limits of permissible concern for those values the amendment is designed to serve. In our view it is at the nonconstitutional level of statutory enactment[13] and common law development that

---

[13] At least twenty-six States have enacted reporter's privilege statutes. See Ala. Code § 12-21-142 (1975); Alas. Stat. § 09.25.150 (1973); Ariz. Rev. Stat. § 12-2237 (Supp. 1979); Ark. Stat. Ann. § 43-917 (1977); Cal. Evid. Code § 1070 (West Supp. 1979); Del. Code Ann. tit. 10, §§ 4320-4326 (1974); Ill. Ann. Stat. ch. 51, §§ 111-119 (Smith-Hurd Supp. 1979); Ind. Code Ann. § 34-3-5-1 (Burns Supp. 1980); Ky. Rev. Stat. § 421.100 (1970); La. Rev. Stat. Ann. §§ 45:1451-45:1454 (West Supp. 1979); Md. Cts. & Jud. Proc. Code Ann. § 9-112 (1979); Mich. Comp. Laws § 767.5a (1971); Minn. Stat. Ann. §§ 595.021-595.025 (West Supp. 1979); Mont. Rev. Codes Ann. §§ 26-1-902 - 26-1-903 (1979); Neb. Rev. Stat. §§ 20-144 - 20-147 (1977); Nev. Rev. Stat. § 49.275 (1979); N.J. Stat. Ann. § 2A:84A-21 (West 1976 & Supp. 1980); N.M. Stat. Ann. § 38-6-7 (Supp. 1980); N.Y. Civ. Rights § 79-h (McKinney 1976); N.D. Cent. Code § 31-01-06.2 (1976); Ohio Rev. Code Ann. § 2739.12 (Baldwin 1978); Okla. Stat. tit. 12, § 2506 (Supp. 1979); Or. Rev. Stat. §§ 44:510 - 44:540 (1979); Pa. Stat. Ann. tit. 28, § 330 (Purdon 1979); R.I. Gen. Laws §§ 9-19.1-1 to 9-19.1-3 (Supp. 1979); Tenn. Code Ann. § 24-113 (Supp. 1979). See generally, Comment, Journalist's Privilege: *In re Farber* and the New Jersey Shield Law, 32 Rutgers L. Rev. 545, 547-550 (1979). In several instances, statutes have been broadened following judicial decisions unfavorable to reporters. *Id.* at 550 n.25. Our own Legislature has failed either to enact proposed legislation that would have created a privilege, see, e.g., 1978 House Doc. No. 3906, 1976 House Doc. No. 888,

precise limitations on the protection to be afforded those persons such as Roche may be best defined.[14]

*Discovery supervision claim.* In addition to his constitutional claim, Roche contends that the single justice abused his discretion by failing to prevent "oppressive, unnecessary, and irrelevant discovery." Roche argues that in supervising discovery, the single justice (and presumably the commission as well in the first instance) was obliged to consider the effect that compelled discovery would have on "the values protected by the First Amendment, [even] though [these values were] entitled to no constitutional privilege." *Herbert* v. *Lando,* 441 U.S. 153, 180 (1979) (Powell, J., concurring). We agree, but conclude that the single justice ·did consider just such a possible effect, and find no error in his order compelling Roche to testify fully.

In exercising control over requested discovery a judge or an administrative tribunal must be particularly sensitive to preventing exposure "for the sake of exposure," *Watkins* v. *United States,* 354 U.S. 178, 200 (1957), or any other use of

---

1975 House Doc. No. 2128, 1974 House Doc. Nos. 5091, 1608, 1973 Senate Doc. Nos. 704, 717, 1973 House Doc. Nos. 5482, 3676 and 3493, 1972 Senate Doc. No. 114, 1971 Senate Doc. No. 683, 1971 House Doc. Nos. 3828, 421, or to enact proposed legislation that would have barred any such privilege, see 1975 House Doc. No. 3686.

[14] Roche's heavy reliance on *Riley* v. *Chester,* 612 F.2d 708, 716-717 (3d Cir. 1979), and cases cited, as establishing a constitutional newsman's privilege is misplaced. The *Riley* court quite explicitly views Federal authority as establishing a newsman's privilege only as a matter of Federal common law, fashioned pursuant to Fed. R. Evid. 501, *id.* at 713-714 ("[W]e are required to interpret Federal common law insofar as it applies to the claimed privilege of a reporter"); *id.* at 715 ("federal common law privilege . . . recognized by . . . other courts"). The Federal Rules of Evidence are not, of course, binding on this court. The Supreme Court, furthermore, has expressed its reluctance to "[fasten] a nationwide rule" of privilege as a matter of constitutional law, *Branzburg* v. *Hayes,* 408 U.S. 665, 699 (1972), and therefore appears unlikely to view a Federal common law rule of privilege as binding on the States. Cf. Monaghan, Foreword: Constitutional Common Law, 89 Harv. L. Rev. 1, 43 (1975). Since this issue has not been presented to us, we intimate no view as to the possible creation of a newsman's privilege as a matter of Massachusetts practice.

discovery as a means of harassing a reporter or other potential witness by forcing the needless disclosure of confidential relationships. See *Ward* v. *Peabody*, 380 Mass. 805, 813-814 (1980); *NAACP* v. *Button*, 371 U.S. 415 (1963). A protective order, for example, would be required if the requested discovery were sought purely as retribution for a written or broadcast news story, or if discovery were sought to "chill" a particular point of view. Furthermore, the same account must be taken of any particular hardship or inconvenience which discovery may impose on a given reporter as is regularly taken of the analogous difficulties confronted by any other potential witness. See *Matter of Pappas*, 358 Mass. 604, 612 (1971) (judge must supervise grand jury proceedings "to prevent oppressive, unnecessary, irrelevant, and other improper inquiry and investigation"); *Dow Jones & Co.* v. *Superior Court*, 364 Mass. 317, 322 (1973) (civil discovery). Mass. R. Civ. P. 26 (c). See also *Ward* v. *Peabody, supra* at 819 (holding that privacy interest should be considered in determining the proper scope of a documentary summons issued in connection with a legislative commission hearing, and noting that "the existence of a personal interest in nondisclosure might well persuade a court against ordering production" of certain arguably relevant documents).

A judge ruling on discovery requests must also take into account considerations of efficiency and economy. As Mr. Justice White stated in *Herbert* v. *Lando, supra* at 177, referring specifically to the Federal Rules of Civil Procedure, discovery provisions "are subject to the injunction of rule 1 that they 'be construed to secure the just, *speedy*, and *inexpensive* determination of every action'" (emphasis in original).

In the present case, the single justice agreed with the commission's assessment that any prior inconsistent statement contained in Roche's interviews with potential witnesses against Judge McKenney would be highly relevant to the judge's case before the commission. No other source existed for these statements.

The single justice also carefully analyzed[15] the effect the denial of Roche's requested protective order would have on his ability to protect the confidentiality of his sources and found this effect to be minimal. The single justice in effect concluded that Roche had already revealed his sources, since Judge McKenney could identify those persons whom Roche interviewed through a time-consuming but wholly mechanical process. Since Roche was willing to be deposed as to any person so identified, the protective order would at best have delayed what was seen as the inevitable disclosure of both Roche's sources and the substance of his interviews.

In view of this assessment of the competing interests, the single justice concluded that the protective order should be denied. In making this assessment the single justice was entitled to a broad measure of discretion. *Matter of Pappas,* 358 Mass. 604, 613 n.13 (1971). We find no abuse of this discretion, and therefore affirm the order of the single justice denying Roche's motion for a protective order, and the subsequent order adjudicating Roche in civil contempt.

*Common law considerations.* We have found that Roche has presented no principled reason for this court to interfere with the orderly and efficient process of discovery in this case. Nevertheless, we note our willingness to consider, in

---

[15]No similar process of analysis was required in the two previous cases in which we have considered claims similar to those now advanced by Roche. In *Matter of Pappas,* 358 Mass. 604 (1971), we rejected a claim that the First Amendment entitled a reporter (in the absence of a showing by the Commonwealth similar to what Roche now suggests must be made by Judge McKenney) to refuse to appear before a grand jury investigating criminal conduct of which the reporter was alleged to have had personal knowledge. And in *Dow Jones & Co.* v. *Superior Court,* 364 Mass. 317 (1973), we held that the First Amendment did not entitle a defendant in a libel action to refuse to disclose the identity of her "confidential source" whose quoted and allegedly defamatory statements formed the basis of the suit. In each of these cases, the need for the reporter's testimony was so compelling (firsthand observations of criminal activity; revelation of the source of libelous remarks forming the basis for the entire law suit), and in one case, the impact on the First Amendment interests so relatively slight (mere appearance before a grand jury, where revelations of "confidential" information might or might not have been required), that we could say categorically that the reporter's claim must be denied.

future cases, whether the central role a free discussion of public issues plays in a self-governing society requires, as a matter of Massachusetts practice, that persons addressing such issues be afforded more clearly defined protection against intrusive discovery than that provided by the discretionary supervision contemplated by Mass. R. Civ. P. 26 (c), as described *supra* at 636-637. That courts should play an active role in defining these limits at a nonconstitutional level seems particularly appropriate in view of our traditional responsibility for fashioning rules of evidence. The incremental process of common law development would address the need to avoid overly broad generalizations that in some cases may result in depriving litigants of relevant evidence or inhibiting speech.[16] See *Branzburg* v. *Hayes,* 408 U.S. 665, 710 (1972) (Powell, J., concurring) ("tried and traditional"; "case-by-case basis").[17]

---

[16] "It is the merit of the common law that it decides the case first and determines the principle afterwards. Looking at the forms of logic it might be inferred that when you have a minor premise and a conclusion, there must be a major, which you are also prepared then and there to assert. But in fact lawyers, like other men, frequently see well enough how they ought to decide on a given state of facts without being very clear as to the *ratio decidendi.* In cases of first impression Lord Mansfield's often-quoted advice to the business man who was suddenly appointed judge, that he should state his conclusions and not give his reasons, as his judgment would probably be right and the reasons certainly wrong, is not without its application to more educated courts. It is only after a series of determinations on the same subject-matter, that it becomes necessary to 'reconcile the cases,' as it is called, that is, by a true induction to state the principle which has until then been obscurely felt. And this statement is often modified more than once by new decisions before the abstracted general rule takes its final shape. A well settled legal doctrine embodies the work of many minds, and has been tested in form as well as substance by trained critics whose practical interest it is to resist it at every step. These are advantages the want of which cannot be supplied by any faculty of generalization, however brilliant . . . ." Justice Oliver Wendell Holmes, Codes, And the Arrangement of the Law, 5 Am. L. Rev. 1, 1 (1870).

[17] Considerations of the dangers inherent in generalization may well underlie the Legislature's repeated refusal to enact a press "shield" law. See note 13, *supra.*

In sum, the development of initially narrow common law rules, subject to modification by the Legislature or this court in light of future experience, might represent an appropriately cautious initial step toward developing a set of coherent guidelines capable of governing the complex and troubling conflict between the public interest in free and informed expression and the equally compelling public interest in securing all evidence necessary to fair and accurate adjudication. To the extent that definite rules were to evolve as limits on the otherwise discretionary balancing of these competing interests, news reporters and sources might be able to base their behavior on better defined expectations, thus encouraging informed expression. Cf. *Branzburg* v. *Hayes,* 408 U.S. 665, 702-703 n.39 (1972) (uncertainty inherent in ad hoc balancing defeats desired goal of encouraging exchanges of information by protecting confidentiality). The existence of such guidelines and the development of creative alternatives to enforcement by contempt proceedings might even go a considerable distance toward eliminating the all too often unnecessary confrontations between what some have termed "the imperial judiciary" and "the paranoid press." Dale & Dale, Full Court Press, The Imperial Judiciary v. The Paranoid Press, 7 Pepperdine L. Rev. 241 (1980).

The order of the single justice entitled "Adjudication of Civil Contempt" is affirmed.

*So ordered.*

QUIRICO, J. (with whom Liacos, J., joins, concurring in the result and the reasoning in support thereof, but not in the concluding dictum of the opinion). I concur with the result reached by the court in its opinion and with all of the reasoning in support of that result. In short, I concur with the opinion to the end of the second part thereof entitled *"Discovery supervision claim."*

I do not believe that the concluding part of the opinion entitled "*Common law considerations*" is essential to the decision of this case, and therefore consider it dictum. While I agree with the general statements therein about the continuing development of the common law, I do not join that part of the dictum which appears to be a current commitment to a future recognition of a common law equivalent of a so called press "shield" law. That is a subject on which regulation has been sought from the Legislature without success to date. I believe that judicial action or commitment on the subject should await a decision directly involving an issue thereon.