van Gestel,
J. This matter came before the Court on September 12, 2002, on an emergency motion by the defendants seeking a protective order regarding all outstanding discovery in this case. The Court heard counsel for both sides and allowed the motion temporarily in order to give the Court some time to more carefully consider the parties’ respective positions. What follows is the Court’s further assessment of the situation and its further Order thereon.
BACKGROUND
What is involved is a claim under one of two promissory notes involving a corporation named The Olive Group Corp. (“OGC”), which owns and controls several restaurants in Boston, New York, Washington, D.C. and elsewhere. OGC is a Delaware corporation. Chesapeake Investment Services, Inc. (“Chesapeake”), through an alleged foreclosure, claims ownership, and consequently the right to operate and control the physical assets, of Omega III, LLC (“Omega”). Omega is a Delaware limited liability company. OGC is the sole member of Omega. Omega, among other things, operates Todd English’s Kingfish Hall, a restaurant in Boston’s Quincy Market. Chesapeake lent certain money to OGC and now claims that OGC is in breach of its borrowing obligations and as a result Chesapeake asserts that it has foreclosed on Omega.
Fleet National Bank (“Fleet”) is the primary lender to OGC, and it has required a subordination of Chesapeake’s loans and the rights of enforcement thereunder to that of Fleet. Fleet — at this time, at least — is not pressing any claims against OGC. Indeed, on July 10, 2002, Fleet’s counsel wrote to Chesapeake’s President asserting that Chesapeake’s actions were, in part at least, in violation of a July 11, 2001 letter agreement between Fleet and Chesapeake regarding the matters in issue.
Further, there are serious legal questions about whether Chesapeake has taken the appropriate action under the Uniform Commercial Code to perfect its rights in Delaware, the locus of OGC, a Delaware corporation.
On the surface, what is at stake is the indebtedness of OGC to Chesapeake which initially was $450,000 and has now been paid down to something in excess of $300,000. At the oral argument on the motion for a protective order, counsel for OGC reported that all payments from OGC to Chesapeake were being made on a timely basis and that there were no arrearages at the present time. Counsel for Chesapeake responded by suggesting, surprisingly, that while it was true that the payments were being received, they were being sent back because of Chesapeake’s ownership claim in Omega and its assets.
It is the ownership claim that really is what is in play. Chesapeake seemingly does not care about the $300,000+ outstanding indebtedness. Rather, it is attempting to parlay certain alleged defaults in the loan agreement documents — not to Chesapeake, but rather to others who do not seem to be concerned— into a way to seize control of Omega’s assets which are worth vastly more than the debt due to Chesapeake. This can be seen by the most significant prayer for relief in Chesapeake’s amended complaint which asks that “the Court issue a permanent injunction granting Chesapeake the authority to operate and control the physical assets of Omega and enjoining the Olive Group [OGC] from interfering with the operation and control of the physical assets of Omega.” See Amended Complaint, Prayer 3.
Chesapeake now has embarked on an aggressive discovery program that includes contacting and noticing the depositions of several of the defendants’ largest trade vendors. This, of course, while possibly a matter of right under the Rules of Civil Procedure, can have a serious effect of the defendants’ ongoing business relationships with those vendors.
As part of its discovery, Chesapeake also has noticed the deposition of the President and Chief Executive Officer of Fleet Bank, the defendants’ principal lending institution. Fleet, one of the country’s largest banks, is by far the largest bank in Boston. It is doubtful that Fleet’s President, as opposed to one of its loan officers, will have much detailed knowledge about the status of the defendants’ accounts. Noticing Fleet’s President for a deposition, however, may not be helpful in assuring that the defendants will be able to maintain a smooth banking relationship with their principal lender and can be viewed as annoying and harassing.
DISCUSSION
This Court is subject to the injunction to construe and apply the Rules of Civil Procedure in a manner “to *286 secure the just, speedy and inexpensive determination of every action.” Mass.R.Civ.P. Rule 1. See, e.g., In the Matter of Roche, 381 Mass. 624, 637 (1980).
In determining whether a protective order should issue, a judge must assess the competing interests of preventing “annoyance, embarrassment, oppression, or undue burden or expense,” . .. and considerations of an efficient and just resolution of the action . . . “In making this assessment [a judge is] entitled to a broad measure of discretion.”
Wansong v. Wansong, 395 Mass. 154, 156 (1985).
Mass.R.Civ.R Rule 26(c) gives the Court a number of possible options in considering a motion for a protective order, including: “(1) that discovery not be had; [or] (2) that discovery may be had only on specified terms and conditions, including a designation of the time or place.”
As noted above, there are a number of legal issues surrounding the question of whether Chesapeake has taken the appropriate steps to achieve its ownership interest in Omega. Included among those issues are:
whether Chesapeake’s loan to the Olive Group Corporation, which is secured by Omega’s assets, is explicitly subordinated to Fleet Bank which retains enforcement rights in the event of a default and has yet to act on these rights;
whether Chesapeake has failed to perfect its security interest in Omega by filing a financing statement in Delaware as required by the U.C.C.;
whether Chesapeake can foreclose on its collateral without first obtaining the consent of Fleet Bank and subsequently conducting a secured party sale; and
whether the grounds for default alleged in Chesapeake’s notice of default are insubstantial and frivolous.
Given the facts — readily conceded by Chesapeake— that its loan is not in arrears, that payments are being tendered regularly and that the amount remaining due is only $300,000+, and that its real objective is to acquire ownership of alleged security for that loan over assets worth many times the amount of the indebtedness, this Court is inclined to permit the defendants to attempt to narrow and focus the issues through dispositive motion practice before allowing a continuance of what gives the impression of being veiy annoying, embarrassing, oppressive, unduly burdensome and expensive discovery. The granting of such a protective order pending resolution of a potentially dis-positive motion is well within this Court’s powers. See, e.g., E.A. Miller, Inc. v. South Shore Bank, 405 Mass. 95 (1989).
ORDER
For the foregoing reasons, the Emergency Motion of Defendants/Plaintiffs-In-Counterclaim for a Protective Order is ALLOWED and all discovery in this case is stayed pending further order of the Court.
Further, the defendants shall have until no later than November 1, 2002, to serve, consistent with Superior Court Rule 9A(b)(5), upon the plaintiff and defendant-in-counterclaim such fully supported dis-positive motions as they believe will resolve some or all of the outstanding issues in this case. The plaintiff and defendant-in-counterclaim shall have thirty days from the date of service of any such motion(s) by the defendants to serve their duly supported opposition thereto. Any such motion packages shall thereafter be filed with the Court no later than December 13, 2002 and are set down for oral argument on December 16, 2002 at 2:00 p.m.