**BOOK MART, INC.,
COAST VENDING, INC.,
FANTASY BOOK SHOP, INC.,
FIRST AMENDMENT, LTD.,
LIBERTY BOOK SHOP. INC..
200 BOOK CLUB, INC.**

vs.

**MAYOR OF THE CITY OF
BOSTON, EXECUTIVE DIRECTOR
OF THE MAYOR'S OFFICE OF
CONSUMER AFFAIRS & LICENSING
AND POLICE COMMISSIONER
FOR THE CITY OF BOSTON**

No. 57895

Superior Court/Suffolk, ss
Commonwealth of Massachusetts

**December 20, 1982**

Regina L. Quinlan, counsel for plaintiff.
James Thaddeus McDevit, counsel for defendant.

## MEMORANDUM OF DECISION

This action for declaratory and injunctive relief comes before the court upon a stipulation of material facts which amounts to a case stated. **Frati v. Jannini,** 226 Mass. 430, 431 (1917) (Rugg, C.J.). In many cases, the litigants proceed in ignorance of the law; in some there is an absence of controlling legal precedent. In the present instance, in contrast, there is a surfeit of legal decisions and the parties appear to have parsed them exceedingly fine. To understand the case, therefore, it is necessary to understand a bit of recent legal history.

Since at least 1805, this Commonwealth has statutorily regulated public amusements. St. 1805, c. 98, secs. 1, 3. As amended through St. 1971, c. 996, G.L. c. 140, sec. 181, empowered a municipality to license theatrical exhibitions, public shows, and public amusements and exhibitions of every description "upon such terms and conditions as (the mayor or selectmen may) deem reasonable." A Boston ordinance enacted pursuant to that statute which empowered the mayor to deny a license if "the granting of said license would lead to violations of the public safety, health, or order", was declared unconstitutionally vague in **Galarelli v. White,** Civ. No. 73-2587-G (D. Mass., Sept. 21, 1973) (unpublished). Identical language appearing in a Fitchburg ordinance was struck down as

unconstitutionally vague in **City of Fitchburg v. 707 Main Corp.,** 369 Mass. 748 (1976) (Braucher, J.).[1] Apparently acting in light of these decisions, in August, 1978, the Boston City Council passed and the Mayor approved a city ordinance which more specifically spelled out the grounds upon which a theatrical license might be denied as follows:

"(The license may be denied if) the granting of the license at the premises would lead to or cause an offense under any applicable law, code, or ordinance; or would lead to the creation of a nuisance or otherwise endanger the public health, safety, or order by (a) unreasonably increasing pedestrian or vehicular traffic in the area in which the premises are located; or (b) increasing the incidence of illegal or disruptive conduct in the area in which the premises are located; or (c) unreasonably increasing the level of noise in the area in which the premises are located; or

(d) otherwise significantly harming the legitimate protectable interests of the affected citizens of city.

No application shall be denied if the anticipated harm is not significant or if the likelihood of its occurrence is remote." 14 City of Boston Code, sec. 428.

In 1979, the Legislature got around to amending G.L. c. 140, sec. 181. The statutory amendment largely tracks sec. 428 of the City of Boston Ordinances, as amended, quoting the first three subsections set out above substantially verbatim but deleting the words "illegal or" in Subsection (b) and not adopting Subsection (d) or the general condition that "no application shall be denied if the anticipated harm is not significant or if the likelihood of its occurrence is remote." G.L. c. 140, sec. 181, as amended by St. 1979, c. 358, sec. 3.[2]

Since the United States District Court had declared the earlier Boston licensing regulations unconstitutional in **Galarelli v. White, supra,** the owners of adult book stores offering coin-operated motion pictures for pay in the City of Boston (peep shows), of course, continued doing business albeit without licenses. The August, 1978, amendments to secs. 427 and 428 of the City of Boston code, Ordinance 14, changed this situation by imposing a presumably constitutional licensing requirement upon these peep show operators. The mayor having delegated his licensing authority to the Executive Director of the Mayor's Office of Consumer Affairs and Licensing (Executive Director), the peep show operators commenced applying for licenses to the Executive Director. Apparently from the inception of the ordinance as amended, it has been the policy of the Executive Director to require applicants for an entertainment license to provide the name and home address of each officer, each director, and each stockholder (stockholders being required to supply the amount of stock in the corporation owned by each). Until recently, however, it has been the practice of the Executive Director not to refuse to issue a license where an applicant has not made disclosure of the names and home addresses of the stockholders.

On November 17, 1980, the Executive Director denied entertainment licenses to three peep show operators, who

---

[1]The decision of the Court of Appeals for The First Circuit in **Fantasy Book Shop, Inc. v. The City of Boston,** 652 F.2nd 1115, 1118 (1981)—of which more anon—states that it was G.L. c. 140, § 181 itself that was declared unconstitutionally vague in **Fitchburg v. 707 Main Corp., supra.** This appears to be an error. **Fitchburg v. 707 Main Corp., supra,** dealt only with the Fitchburg ordinance and not with the statute itself.

[2]In **Fantasy Book Shop, Inc. v. City of Boston, supra,** at 1118-1119, the Court of Appeals for the First Circuit indicates that the Boston ordinance is taken from the state statute. Actually, the chronology set out above appears correct, the original draftsmanship being that of the Boston City Council and the ordinance later being adopted in significant part as a generalized statutory policy for the Commonwealth.

immediately brought suit, challenging the constitutionality of sec. 428 of the City of Boston Code, Ordinance 14, upon the grounds that it was a prior restraint not justified as a time, place and manner restriction or by a compelling state interest; that it failed to provide necessary procedural safeguards for the denial of the license; and that the substantive standards established by the ordinance were both vague and over broad, lacking narrow or definite standards and investing the licensor with impermissible discretion. This litigation found its way to the Court of Appeals for the First Circuit, which, during the summer of 1981, issued its decision in **Fantasy Book Shop, Inc. v. City of Boston,** 652 F.2nd 1115 (1st Cir. 1981). That decision held that sec. 428 was not **per se** impermissible as a prior restraint upon First Amendment expression, **id** at 1121, but that Subsection (d) was unconstitutionally vague and "the facially valid statutory criterion relied upon approaches the outer limits of permissible vagueness". **Id** at 1125. In light of these rulings, the Court of Appeals remanded the case to the District Court for a factual determination concerning whether the licenses in question had been denied on permissible or impermissible grounds.

Against this background, the City has apparently decided to force the issue of its right to demand the names of shareholders in corporations operating peep shows as part of the licensing process. On September 24, 1982, the Executive Director requested by letter that the peep show operators provide the names and addresses of their shareholders, asserting that the information was "required in order to determine whether the licenses exercised at the (plaintiffs') locations . . . will increase illegal or disruptive conduct in the area." On the last day allowed by the Executive Director to respond to this letter, the peep show operators who are the plaintiffs in this case declined to provide the information sought. The Executive Director promptly caused a public hearing to be held "to determine whether the entertainment license of (each of the plaintiff) corporations should be revoked or suspended". The hearing was duly held. Other than verbal jousting between the members of the Licensing Division and their counsel and counsel for the plaintiff peep show operators, there was but one fact witness. He testified that the sole officer and director of the plaintiff 200 Book Club Inc., was also the sole officer and director of Joe P. Enterprises, Inc., four other shops in the Combat Zone, so-called, and the sole proprietor of Adult House. This witness also said that persons by the name of Palladino originally formed the officers and directors of Joe P. Enterprises, Inc., and claimed that "I do have a confidential source. I admit I have not seen any public documentation to this fact, but I did see a public source who told me that the Angiulo family gave money to the Palladinos recently." Finally the witness complained that the "United States Supreme Court legitimizes porno" and made statements concerning a magazine purchased at the plaintiff Book Mart, Inc., from which one might infer that it depicted child pornography. Upon the close of the hearing, without consultation with the other municipal officials present, the Executive Director ordered the licenses of the plaintiff peep show operators "revoked as of this evening at the close of business." On that same day, she stated in substance, "We want to make sure that the people operating and owning the peep shows aren't people who have prior convictions regarding obscenity laws and child pornography, the illegal admission of minors into entertainment establishments, or the maintenance of unlicensed entertainment." The instant action for declaratory and injunctive relief was filed immediately.

The immediate dispute between the parties—whether the Executive Director can properly suspend the licenses of the uncooperative peep show owners, may be resolved by resort to a single, narrow

ground of decision set forth explicitly in the controlling cases. The broader declaration of rights which is sought will require additional analysis.

"Expression by means of motion pictures . . . is included within the free speech and free press guarantees of the First and Fourteenth Amendments to the Constitution of the United States. **Joseph Burstyn, Inc., v. Wilson,** 343 U.S. 495, 502 (1952). **Brattle Films, Inc. v. Commissioner of Pub. Safety,** 333 Mass., 58, 60, (1955). A law which requires that the exercise of First Amendment rights be subject to license must contain narrow, objective and definite standards, or it is void for vagueness. **Shuttleworth v. Birmingham,** 394 U.S. 147, 150-151 (1969), and cases cited. See **Commonwealth v. A Juvenile,** 368 Mass. 580, 595 n.15 (1975)." **Fitchburg v. 707 Main Corp.** 369 Mass. 748, 752 (1976) (Braucher, J.). "(W)here as here, the facially valid statutory criterion relied upon approaches the outer limits of permissible vagueness, the denial of a license for protected activity must be based on and accompanied by articulation of, specifically identifiable findings." **Fantasy Book Shop, Inc. v. City of Boston,** 652 F.2d 1115, 1125 (1st Cir. 1981). The action of the Executive Director in suspending the licenses of the plaintiff peep show operators was not "accompanied by articulation of specifically identifiable findings." Indeed, no findings whatsoever appear to have been made. Thus, because the action of the Executive Director implicates First Amendment rights and the controlling decisional law requires that such action be based on identifiable findings, their absence is fatal to the maintenance of the action she has taken and the suspension must be declared void and of no effect.

The Executive Director seeks to avoid this result by asking the Court to keep in mind that commercial speech is afforded less protection than non-commercial expression. She is correct in this regard. It is now settled that commercial speech is entitled to First Amendment protection, but to less protection than is afforded other types of speech.

In concluding that commercial speech enjoys First Amendment protection, we have not held that it is wholly undifferentiable from other forms. There are commonsense differences between speech that does "no more than propose a commercial transaction," **Pittsburgh Press Co. v. Human Relations Comm'n,** 413 U.S., at 385, and other varieties. Even if the differences do not justify the conclusion that commercial speech is valueless, and thus subject to complete suppression by the state, they nonetheless suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired. **Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,** 425 U.S. 748, 771-72 n.24 (1976). Expression concerning purely commercial transactions has come within the ambit of the Amendment's protection only recently. In rejecting the notion that such speech "is wholly outside the protection of the First Amendment," **Virginia Pharmacy,** 425 U.S. at 761, we were careful not to hold "that it is wholly undifferentiable from other forms" of speech. **Id.,** at 771 n.24. We have not discarded the "commonsense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. **Ibid.** To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's

guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression. **Ohralik v. Ohio State Bar Ass'n,** 436 U.S. 447, 445-456. The interest in free speech consists of both the advertiser's right to communicate his message and the public's right to receive it. **Cf. Virginia State Board,** 425 U.S., at 762-63.

The Executive Director errs, however, when she suggests that a peep show is commercial speech. With peep shows, one pays for the content of, the communication. This is legally indistinguishable from paying for a newspaper, a movie, a rock concert, a stage show, or buying a book. In each of these activities, all of them operated for profit by the newspaper, entertainment, and publishing industries, one is paying for the content of the communication. In contrast, typically commercial speech does "no more than propose a commercial transaction". **Pittsburgh Press Co. v. The Human Relations Comm'n,** 413 U.S. at 385. **Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,** 425 U.S. 748, 771-72 n.24 (1976).[3]

Indeed, the case cited by the Executive Director as supportive of the conclusion that peep shows are commercial speech in fact illustrates the distinction just made. In **Olitsky v. O'Malley,** 597 F.2nd 295, 301 (1st Cir. 1979), the Court of Appeals upheld, against a First Amendment challenge, the "mingling" regulations adopted by the City of Boston to control the conduct of scantily-clad exotic dancers with patrons of adult bars in Boston's Combat Zone. When such an individual asks the patron of a bar to buy her an overpriced, watered-down drink, she does no more than propose a commercial transaction, and the speech and conduct by which she proposes such a transaction may be properly labeled commerical speech.[4] However, when the same dancer is engaged in presenting her so-called exotic performance, she is protected, so long as the performance is not obscene, by the full force of the First Amendment even though patrons may have paid to watch her perform. **Commonwealth v. Sees,** 374 Mass. 532, 636 (1978) (Braucher, J.).[5]

"(A)s a majority of the Supreme Court has recently reaffirmed—sexually explicit but non-obscene materials, however distasteful, are entitled to no less protection than other forms of expression. See **Young v. American Mini-Theaters,** 427 U.S. 50, 73, 96 S. Ct. at 2453 (Powell, J. concurring); **id.** at 84 (dissenting opinion of four justices); **Hart Book Stores, Inc. v. The Edmisten,** 612 F2nd 821, 826-28 (4th Cir. 1979)." **Fantasy Book Shop, Inc. v. The City of Boston,** 652 F2nd 1115, 1126 (1st Cir. 1981).

---

[3] Of course, the distinction drawn above does not cover the field. Indeed, not-for-profit speech such as political debate is perhaps at the core of First Amendment values. The text simply draws what seems to be the appropriate distinction between commercial speech and other forms of for-profit communication which enjoy the full protection of the First Amendment.

[4] Of course, the patron is buying more than a drink. At minimum he is purchasing the company of the dancer. As the **Olitsky** decision turned on the regulatory powers found in the 21st Amendment, the Court of Appeals had no occasion to express an opinion concerning whether the "mingling" itself constitutes speech or association or both. This court expresses no such opinion.

[5] No issue is presented in this case that the premises of the plaintiff peep show operators are involved in dispensing alcoholic beverages and may be regulated on that score. **Doran v. Salem Inn, Inc.,** 422 U.S. 922, 932-934 (1975). As **Commonwealth v. Sees, supra,** makes clear, non-obscene nude dancing which does not involve mingling with other employees or with patrons is protected by the free speech provision of Article 16 of the Massachusetts Declaration of Rights even on premises which dispense alcoholic beverages.

Since the "expression" involved in these peep shows is, unless obscene, fully protected by the First Amendment and since interference with such protected expression must be supported by articulable findings of fact, as discussed above, none of which are present here, the suspension of the licenses of the plaintiff peep show operators must, as noted above, be declared void and of no effect.

The peep show operators are not content to stop there, however; they go further to seek a declaration that the requirement to identify stockholders violates the Constitutions of the United States and this Commonwealth and, in any event, exceeds the authority conferred by G.L. c. 140, sec. 181. Accordingly, the parties have thoroughly briefed the constitutional and statutory issues and explored and argued the controversy between them. It is apparent that, while the narrow ground of decision relied upon above is dispositive of the parties' immediate confrontation, the Executive Director will soon be back with articulated findings, remedying the narrow problem but presenting the underlying controversy afresh. Since "(O)ne of the principal purposes of the declaratory judgment law is to settle completely the controversy submitted for decision," **Kilroy v. O'Connor,** 324 Mass. 238, 242 (1949), **Municipal Lighting Comm'n of Peabody v. Stathos,** 13 Mass. App. Ct. 990 (1982), it is proper to proceed to a declaration of the underlying rights involved in the present controversy.

At the most general level, it can hardly be supposed that the plaintiff peep show operators have some privilege of constitutional dimension against disclosure of the names of their stockholders. It is the Commonwealth itself which affords them the privilege of doing business in the corporate form and confers substantial legal and tax advantages on those who do business in this fashion. See G.L. c. 156 and 156B. With this privilege comes a concomitant responsibility. Those who invest in corporate businesses can have no expection that the fact of their investment, its extent, or its duration will be held privileged should disclosure be necessary in the aid of any lawful judicial proceeding. This is a necessary implication from the express provision that "stock and transfer records . . . shall be competent evidence in any court of the Commonwealth." G.L. c. 156B, sec. 32. Indeed, public disclosure of stock investments is frequently required in the context of Federal Securities regulation. See e.g. 15 U.S.C. sec. 77aa(6) (names and addresses of all persons owning of record or beneficially more than ten percent of any class of stock in a publicly held company to be disclosed in the registration statement); 15 U.S.C. sec. 781(b) (1)(D) (additional detailed disclosure required of owners of ten percent of any class of stock of any publicly held company).

Mandatory disclosures in two other areas directly implicating First Amendment rights demonstrate the absurdity of any contention that there can be a constitutionally based privilege against disclosing the identities of shareholders in corporations operating peep shows. First, it is now clear that, despite the important First Amendment values inherent in the newsgathering and dissemination function, there is no constitutional privilege conferred upon a reporter to refuse to disclose his sources under either the Constitution of the United States, **Branzburg v. Hayes,** 408 U.S. 665 688 (1972), **Commonwealth v. Corsetti,** 387 Mass. 1, 4 (1982). In the **Matter of Roche,** Mass. Adv. Sh. (1980) 2203, 2211, **Dow Jones & Co. v. The Superior Court,** 364 Mass. 317, 320 (1973), or under the Constitution of the Commonwealth. **In the Matter of Pappas,**

358 Mass. 604, 612 (1971).[6]

Perhaps bearing even more directly upon the points in issue here is the analysis of the Supreme Court in upholding the reporting and disclosure requirements of the Federal Election Campaign Act of 1971, 2 U.S.C. sec. 431 et seq. (1970 Ed., Supp IV). **Buckley v. Valeo,** 424 U.S. 58, 60-75 (1976).

> The disclosure requirements (of the act) have two major parts; recipients must report all contributions of ten dollars or more, 2 U.S.C. sec. 432(c) (supp. IV 1974), and contributors must file with the Federal Election Commission each year in which they independently spend or contribute at least one hundred dollars relative to a clearly identified candidate. **Id.** sec. 437e. Information filed is to be a matter of immediate public record. Plaintiffs contended that such disclosure was unconstitutional because it would chill associational rights by discouraging financial support of unpopular parties and candidates . . . The majority acknowledged that at least some inhibition of associational rights was invitable ("It is undoubtedly true that public disclosure . . . will deter some individuals", 424 U.S. at 68) but would not strike down the regulations absent a factual record evincing substantial burdens on First Amendments rights. Judicially created exemptions would be forthcoming, the Court indicated, to the extent that specific groups could demonstrate a "reasonable probability" that potential contributors would be deterred.

In view of the restricted nature of constitutional privileges and the varied settings in which disclosure requirements have been implemented and upheld, it would be next to frivolous to suggest that the peep show operators could somehow shield their stockholders from disclosure in the course of a judicial proceeding.

There are very real limits, however, upon the executive or legislative power to act when disclosure is designed to affect or regulate the content of communication. Such disclosure "clearly constitutes a requirement which has a substantial deterrent effect on the free exercise of First Amendment rights which cannot be justified without a substantial showing of the necessity for such restriction. **Talley v. California,** 362 U.S. 60; **Bates v. City of Little Rock,** 361 U.S. 516; **N.A.A.C.P. v. Alabama,** 357 U.S. 449." **Broadway Distributors, Inc. v. White,** 307 F. Supp. 1180, 1183 (D. Mass. 1970) (Ford, J.).

> Any government regulation that limits or conditions in advance the exercise of protected First Amendment activity constitutes a form of prior restraint, see **Southeastern Promotions, Ltd. v. Conrad,** 420 U.S. 546, 552-58 (1976), and any such restraint comes "bearing a heavy presumption against its constitutional validity". **Id.** at 558, quoting **Bantam Books, Inc. v. Sullivan,** 372 U.S. 58, 70, See **New York Times Co. v. United States,** 403 U.S. 713, 714, (1971); **Shuttlesworth v. Birmingham** 394 U.S. 147 (1969).
>
> At the same time, however, it is clear that not all prior restraints are constitutionally

---

[6]"[S]tate courts have . . . decisively rejected the Supreme Court's invitation to fashion their own, more expansive [constitutional] protections for free expression. . . . Very few state courts have interpreted their state constitutions' free press provision more broadly than the Branzburg court construed the First Amendment."

"Developments in the Law: The Interpretation of State Constitutional Rights," 95 Harv. L. Rev. 1324, 1406-1407 (1982). See generally Note, "Developments in the News Media Privilege; Qualified Constitutional Approach Becoming Common Law," 33 Me. L. Rev. 401 (1981) (arguing that the courts have preferred the common law approach to the recognition of a constitutional privilege).

impermissible. See **Near v. Minnesota,** 283 U.S. 697 (1931). Regulations governing in advance the time, place or manner of expression permitted in a particular public forum are valid if they serve important state interests by the least restrictive means possible. See **Erznoznik v. City of Jacksonville,** 422 U.S. 205, 209 (1975); **Cox v. Louisiana,** 379 U.S. 536, 554 (1965). Put another way, a regulation that is directed primarily at conduct or at non-communicative aspects of protected expressive activities is permissible despite an incidental prior burden on expression if it is justified by sufficiently strong permissible government interests. See **Konigsberg v. State Bar of California,** 336 U.S. 36, 50-51, (1961). These standards have been stated in terms of a four-part test: "(1) if it is within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on . . . First Amendment freedoms is no greater than is essential to the furtherance of that interest." **United States v. O'Brien** 391 U.S. 367, 377 (1968). See generally Tribe, American Constitutional Law, secs. 12:2 at 580-82, 12:20 at 682-84 (1978) (unlike government action aimed at communicative impact, action aimed at non-communicative impact but having impact on communication will be analyzed by balancing regulatory interests against First Amendment values; only "unduly restrictive regulations unconstitutional"). **Fantasy Book Shop, Inc. v. The City of Boston,** 652 F.2nd 1115, 1120-1121 (1st Cir. 1981).

Content-based prior restrictions are, then, unconstitutional although time, place, or manner of expression restrictions may survive if they pass the above-quoted four-part test.

The First Amendment restraints limned above do not apply either to obscenity, **Chaplinsky v. New Hampshire** 315 U.S. 568 (1942), or child pornography i.e. non-obscene material depicting sexual conduct by children. **New York v. Ferber,** 102 S Ct. 3348 (1982).[7] Such communication is said to be "unprotected" and criminal sanctions may be imposed for engaging in such communication.

It is one thing to say that such speech is unprotected and to punish it after it is made. It is quite another to prevent the speech from being made at all. Such prior restraint is anathema to First Amendment values and only an amply justified concern for the most immediate and direct impact of unprotected speech can ever justify it. See **New York Times Co. v. United States,** 403 U.S. 713, 715-716 (1971). **Near v. Minnesota,** 283 U.S. 697, 716 (1931) (the need to prevent obstruction to military recruiting in war time or to prevent the sinking of a troop transport at sea might justify a prior restraint of expression). See also "The Supreme Court, 1970 Term," 85 Harv. L. Rev. 3, 201 (1971). To understand the reach of this principle consider this

---

[7] "In 1977, press coverage of the emergence of a nation-wide, multi-million child pornography market became a catalyst for state and federal legislative action. See e.g., "Child's Garden of Perversity," Time, April 4, 1977, at 55; "Child Pornography: Sickness for Sale," Chicago Tribune, May 15, 1977, at 1, col. 1 (first of four-part serial on child pornography). Among the states responding to this press coverage was [Massachusetts which passed St. 1977, c. 917, § 2 codified as G.L. c. 272 § 29A.] . . . The effect of the [Supreme] Court's ruling [in.New York v. Ferber] was to uphold the child pornography statutes of nineteen other states that similarly forbade the distribution of non-obscene material. See 102 S. Ct. at 3351 n.2." "The Supreme Court, 1981 Term," 96 Harv. L. Rev. 62, 141, 142 n 2 & 13 (1982).

hypothetical situation. Suppose the principal and controlling stockholder of three or four of these peep show operations had a long record of obscenity convictions as well convictions for child pornography stemming from the exploitation of children through the production and distribution of such pornographic materials. Suppose this involvement extended over a number of years and was of such a repetitive nature that it was reasonable to suppose that this individual considered the obscenity and child pornography statutes merely a cost of doing business and was quite likely to violate them yet again. Even in these extreme circumstances, however, the First Amendment does not permit such a **prior** restraint on communication as would be involved were an entertainment license denied on the above grounds. In short, the public interest in the free expression of ideas—any ideas—is sufficient to invalidate the prior restraint involved in suppressing or censoring such communication entirely. Thus, even persons convicted of a violation of the obscenity and child pornography laws in the past cannot be denied the right to engage in the book, magazine, movie, or entertainment business. Any such sanction "is analogous to the perpetual injunction against future publishing because of prior violations which was held unconstitutional in **Near v. Minnesota,** 283 U.S. 697 (1931)." **Broadway Distributors, Inc. v. White,** 307 F. Supp. 1880, 1883 (D. Mass. 1970). No prior restraint can be based on past actions but only upon the imminent danger that communications unprotected by the First Amendment will be made in circumstances where the state has a compelling, overriding interest in preventing such speech. **Near v. Minnesota** 283 U.S. 697 716 (1931) (impact on national security). **Chaplinsky v. New Hampshire** 315 U.S. 568 (1942) (obscenity). **New York v. Ferber,** 102 S. Ct. 3348 (1982) (child pornography).

In the present instance, stockholder disclosure is neither explicitly required nor prohibited by either the governing statute or the city ordinance. The Executive Director has taken it upon herself to enforce this requirement by an administrative interpretation which she defends in the course of this adjudicatory proceeding. Her power to proceed by causing such adjudication rather than by prior regulation is undoubted. **Massachusetts Electric Co. v. Department of Pub. Utilities,** Mass. Adv. Sh. (1981) 1277. See **Security & Exch. Comm'n. v. Chenery, Inc.** 332 U.S. 194, 203 (1947). The question which remains is whether she may constitutionally impose such a disclosure requirement as part of a general entertainment licensing scheme and, if so, whether the Legislature has conferred upon her the power to do so. The answer is that, upon the present record, she may not institute any generalized requirement of stockholder disclosure but that, with respect to the particular statutorily defined circumstances not directly implicating First Amendment values, she may constitutionally, upon a showing that there is probable cause to believe that the provisions of licensing statute have been or are being violated by an entertainment licensee or one who, as an officer, director, or shareholder, exercises a controlling influence over the corporation, require shareholder disclosure upon pain of license suspension for failure to comply.

In reaching this result, the constitutional principle which must be kept always in mind is that the Executive Director neither has, nor can there constitutionally be conferred upon her any power to regulate by prior license the content of any communication. **Fantasy Book Shop, Inc. v. City of Boston,** 652 F2nd 1115, 1120-1121 (1st Cir. 1981). A **generalized** requirement that all entertainment licensees must provide a list of their shareholders' names and addresses must always fail, therefore, in the absence of any showing—none is made out here—that there is a continuing systemic but particularized imminent

danger of the communication of unprotected speech.

However, if the Executive Director comes into possession of reliable information that a stockholder in a particular peep show operation, who is suspected of having a controlling shareholder interest in other peep show corporations, is presently engaged in the widespread dissemination of obscenity or child pornography, may she then inquire of the corporation in which there is reliable information that he has a controlling shareholder interest to ascertain with particularity the truth of her information? Assuming a standard of probable cause equivalent to that required for the issuance of a search warrant, there would appear to be no constitutional bar to her making such an inquiry and then taking action with respect to the licensees as to whom there is probable cause to believe that they are engaged in the dissemination of obscenity or child pornography.

Note that the Court finds no constitutional bar. The peep show owners do have the better of the statutory argument. Suspensions of entertainment licenses are governed by City of Boston Code, Ord. 14, sec. 429. That section apparently continues to permit suspension to be justified by appeal to "the public safety, health, or order", precisely the language declared unconstitutionally vague in **City of Fitchburg v. 707 Main Corp.,** 369 Mass. 748 (1976) (Braucher, J.) and **Galarelli v. White,** Civ. No. 73-2587-G (D Mass. Sept. 21, 1973) (unpublished). It is unclear why the city did not amend sec. 429 along with sec. 427 and sec. 428 when it realized that the latter two sections were constitutionally infirm. Since sec. 429 is unconstitutionally vague, license suspensions thereunder will continue to be void, whatever rationale is offered to support them, until such time as the city amends the ordinance to bring it into conformity with constitutional requirements. See **Commonwealth v. Gagnon,** 387 Mass. 567, 574 (1982).

Further, it must be noted that simply amending sec. 429 to conform to the language apparently upheld in **Fantasy Book Shop, Inc. v. The City of Boston** 652, F2nd 1115, 1119 (1st Cir. 1981) may well be insufficient. The statutes of this Commonwealth simply do not confer any such regulatory power as is set forth in sec. 428 upon the Executive Director of the Licensing Division or upon other municipal authorites. In this regard, it is important to understand that Court of Appeals for the First Circuit is, respectfully, in error when, in **Fantasy Book Shop, Inc. v. City of Boston,** 652 F2nd 1115, 1119 (1st Cir. 1981), it states that "the city ordinance (in issue here) in all material respects simply quotes the statute (with the exceptions not here material)." As pointed out above, it would appear that the ordinance predates the statute and the statutory amendment was drawn from the ordinance and not the other way around. See n.2 **supra.** Further, when the Legislature refined G.L. c. 140, sec. 181, it dropped the words "illegal or" from sub-section (b). The Legislature thus manifested an intent to restrict the powers of license denial granted municipal officials to the enumerated statutory provisions. Specifically, the Executive Director has no statutory authority to suspend or deny a license because the grant thereof would endanger the public health, safety, or order by increasing the incidents of illegal conduct in the area in which the premises are located. Instead, she does have the power to suspend or deny a license upon a proper evidentiary showing that the grant thereof would:

1. Itself be illegal.
2. Create a nuisance.
3. Endanger the public health, safety, or order by unreasonably increasing pedestrian or vehicular traffic in the area in which the premises are located.
4. Endanger the public health, safety, or order by increasing the incidents of disruptive conduct in

the area in which the premises are located.

5. Endanger the public health, safety, or order by unreasonably increasing the level of noise in the area in which the premises are located.

G.L. c. 140, sec. 181. This interpretation of G.L. c. 140, sec. 181 is confirmed by a review of the state obscenity statutes which demonstrate a proper concern for restricting any prior restraint upon speech. Under G.L. c. 272, sec. 30, only the Attorney-General or a District Attorney may request an injunction against the dissemination or imminent dissemination of allegedly obscene material and then only before a Justice of the Superior Court. Even this limited power is further restricted, in the case of alleged dissemination of obscene books, by the requirement that the procedures set forth in G.L. c. 272, secs. 28C, D, E, G, and H be pursued first as a condition precedent to the issuance of any such injunction.[8] Neither these statutes nor G.L. c. 140 sec. 181 confer any power of prior restraint upon the Executive Director of the Licensing Division, or indeed, upon any municipal official. Therefore, in granting, denying, or suspending entertainment licenses, the Executive Director must act only to further the purposes of prior regulation expressly set forth in G.L. c. 140, sec. 181. Stated in other words, she has no roving commission to prevent or forestall illegality in any form of communication. Her decisions may not be based in any way upon the contents of any communication. She is not the City Censor; no statute confers any such power upon her.

But this is not to say that she can never obtain from entertainment licensees the names, addresses, and extent of the shareholdings of corporate entertainment licensees. As stated above, while requests for such information necessarily implicate and somewhat chill the expression of First Amendment values, there is no constitutional privilege to withhold such information when lawfully sought. While the concern for the First Amendment prevents a generalized disclosure requirement upon the present record, the Executive Director does have the power, if she is possessed of probable cause equivalent to that required for a search warrant to believe that a licensee has engaged in or is engaging in or causing some conduct proscribed by G.L. c. 140, sec. 181 to inquire, as part of her general licensing responsibilities, into the status of that corporation's shareholders. Likewise, if she has information amounting to probable cause equivalent to that supporting the issuance of a search warrant to believe that an individual who has engaged in or is engaging in or causing conduct violative of G.L. c. 140, sec. 181 is a shareholder of any particular corporation, she may require the corporation to verify or disavow that fact.

Accordingly, this Court declares that the suspension of the licenses of the plaintiff peep show operators is void and of no effect; that there is no constitutional privilege to withhold such information concerning one's shareholders from any lawful investigative inquiry; that the Executive Director, upon the present record, has no grounds to require such disclosure as a general matter; that the Executive Director's licensing powers are limited to the provisions of G.L. c. 140, sec. 181 and that she has no statutory power to inquire into illegality generally; but that if she has probable cause equivalent to that necessary for the issuance of a search warrant to believe that the provisions of G.L. c. 140, sec. 181 or those provisions of the City of Boston Code, Ord. 14, sec. 428 which do not implicate First Amendment values,

---

[8]Indeed, no prior restraint of non-obscene child pornography appears available under the controlling statutes despite the surpassing importance of preventing sexual exploitation and child abuse, the injury to the child from dissemination of such materials, and the fact that the evil to be restricted "*so overwhelmingly outweighs the specific interest,* if any, at stake". **New York v. Ferber,** 102 S. Ct. 3348, 3355-3356, 3358 (1982).

have been or are being violated by a licensee, or if she has probable cause equivalent to that necessary for the issuance of a search warrant to believe that a person possessing a material beneficial interest in a corporate entertainment licensee either has or is violating the provisions of G.L. c. 140, sec. 181 or the provisions of the City of Boston Code, Ord.14, sec. 428 which do not implicate First Amendment values, she may require the corporation to reveal the names, addresses, and extent of ownership of each of its shareholders so as to better implement the non-communicative, regulatory aspects of the general licensing scheme, and may suspend a license for failure to comply once sec. 429 is amended to conform to the provisions of G.L. c. 140, sec. 181.

With the entry of the above declaration of rights as the judgment of the Court, the preliminary injunction heref ore entered is dissolved because there has been no showing that either the city or its officers will fail to conform their conduct to the requirements of the law as declared and because ''a . . . court should avoid unnecessarily dampening the vigor of a (law enforcement agency) by becoming too deeply involved in the (agency's) daily operations, both because of the vital public interest at stake, and because of the danger that the Court could become enmeshed in endless, time-consuming bickering and controversy.'' **Dunigan Enterprises, Inc. v. The District Attorney for the Northern District,** Mass. App. Ct. Adv. Sh. (1981) 192, 194, quoting from **Lewis v. Kugler,** 446 F2nd 1343, 1351 (3rd Cir. 1971).

By the court,

**William G. Young
Justice of the Superior Court**